RAYTHEON COMPANY, Appellant,

v.

BOCCARD USA CORPORATION,
Appellee.

No. 01–10–00950–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

May 10, 2012.

Daniel K. Craddock, Michael Dean Moody, Craddock Massey LLP, Austin, TX, Chad Flores, David M. Gunn, Erin H. Huber, Beck, Redden & Secrest, L.L.P., Houston, TX, Thomas J. Hennessey, Bingham McCutchen LLP, Boston, MA, for Appellant.

John E. Chapoton, Leif A. Olson, H. Ronald Welsh, Welsh & Chapoton, LLP, Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices HIGLEY and BROWN.

## OPINION

LAURA CARTER HIGLEY, Justice.

Boccard USA Corporation sued Raytheon Company seeking to hold it liable for a breach of contract by Raytheon Company's former third-tier subsidiary, United

Engineers International, Inc. ("United Engineers") based on the theory of alter ego. A jury found United Engineers had breached its contract with Boccard and made an affirmative finding on Boccard's alter ego claim against Raytheon Company. Based on the jury's verdict, the trial court rendered judgment against Raytheon Company in favor of Boccard.

Of the four issues raised by Raytheon Company on appeal, the dispositive issue we address is whether Boccard had standing to pursue its alter ego claim. Because we hold that Boccard did not have standing to pursue the claim, we vacate the trial court's judgment and dismiss the case.

### Background Summary

In May 1998, United Engineers entered into a turnkey agreement with Atlantic Methanol Production Company LLC ("AMPCO") in which United Engineers agreed to provide "all design, engineering, procurement, construction, . . . [and] other work necessary to build a methanol production facility" for AMPCO in Equatorial Guinea. To build the plant, United Engineers needed fabricated piping spool, and Boccard agreed to supply such material to United Engineers. In June 1999, the two companies entered into a contract, in the form of a purchase order, setting out the terms of the agreement by which Boccard would supply piping spool to United Engineers. The contract stated that the total price of the order was not to exceed $5.5 million.

Over the next year, disputes arose between the two companies regarding the order. Each side accused the other of not sufficiently performing its obligations under the agreement. For example, Boccard asserted that United Engineers failed to timely supply Boccard with drawings and other information necessary for it to complete the order, and United Engineers contended that Boccard was causing unnecessary delays. Over time, the scope and the cost of order incrementally increased. After the last of the product was shipped by Boccard to United Engineers in May 2000, Boccard claimed that United Engineers still owed it over $3.9 million. United Engineers claimed that Boccard had deviated from the agreement and, as a result, owed money to United Engineers.

Around this same time, United Engineers and its parent company, Raytheon Engineers & Constructors, Inc. ("RE & C"), were sold to Morrison Knudsen, a construction company. Before the sale, United Engineers was a wholly-owned subsidiary of RE & C, and RE & C was a wholly-owned subsidiary of Raytheon Engineers and Constructors International, Inc. ("RECI"), which is in turn, was a wholly owned subsidiary of Raytheon Company ("Raytheon"). Following the sale, Raytheon and RECI remained as parent and subsidiary. After purchasing RE & C and its subsidiaries, including United Engineers, Morrison Knudsen and RE & C merged to form Washington Group International, Inc. ("Washington Group"). At that point, United Engineers became a wholly-owned subsidiary of Washington Group.

About a year after the corporate merger, Washington Group and its subsidiaries, including United Engineers, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in Reno, Nevada. As a creditor, Boccard filed a proof of claim in the bankruptcy court for the monies it claimed were owed by United Engineers on the AMPCO methanol plant project.

When the bankruptcy petition was filed, Washington Group became the debtor-in-possession, acting in the capacity of a

bankruptcy trustee.[1] As debtor-in-possession, Washington Group filed an adversary proceeding in the bankruptcy court against Raytheon and RECI. Among its claims, Washington Group alleged that, before Morrison Knudsen purchased RE & C, Raytheon had depleted RE & C of its working capital rendering it insolvent. It further alleged that Raytheon had misrepresented to Morrison Knudsen the true financial condition of RE & C, failing to disclose a number of RE & C's liabilities. In January 2002, Raytheon and Washington Group entered into a settlement agreement whereby each party mutually released the other from all claims.

In July 2003, Boccard filed an adversary proceeding seeking to resolve its claim against Washington Group. On January 27, 2004, the bankruptcy court signed a stipulated order dismissing Boccard's adversary proceeding with prejudice but allowing Boccard a claim in the bankruptcy proceeding in the amount of $3.1 million. The order expressly provided that it had no res judicata or other preclusive effect.

On April 8, 2004, Boccard filed the instant suit against Raytheon. Boccard asserted, inter alia, that United Engineers breached its contract by failing to pay all amounts owed to Boccard for supplying the fabricated piping spool for the construction of the AMPCO methanol plant. Boccard sought to hold Raytheon liable for United Engineers's breach of contract based on the theory of alter ego. Boccard alleged that, prior to selling RE & C and United Engineers to Morrison Knudsen, Raytheon, and its linear subsidiaries, had disregarded the corporate form to the point that each wholly-owned subsidiary

and its respective parent company were the alter egos of one another. In other words, United Engineers and its parent, RE & C, were alter egos of each other; RE & C and RECI were alter egos; and RECI and Raytheon were alter egos. Boccard claimed that Raytheon, as the ultimate parent corporation in the chain, was liable for United Engineers's breach of contract.

Raytheon filed a motion for partial summary judgment in which it challenged Boccard's alter ego claim. Raytheon asserted, inter alia, that Boccard did not have standing to assert an alter ego claim because the claim belonged exclusively to the bankruptcy estate. Raytheon argued that, pursuant to the Bankruptcy Code, only the bankruptcy trustee, or as in this case, the debtor-in-possession, has standing to assert a claim owned by the bankruptcy estate.

The trial court denied Raytheon's motion for partial summary judgment. The case proceeded to trial before a jury. The jury found in favor of Boccard on its breach of contract and alter ego claims. The trial court rendered judgment on the jury's verdict, awarding Boccard $3,444,513.62 in damages.[2] This appeal followed.

## Standing

In its first issue, Raytheon asserts that Boccard lacked standing to assert its alter ego claim. Without the alter ego claim, Boccard cannot recover against Raytheon for breach of contract.

---

1. Rather than a trustee, the debtor ordinarily manages the bankruptcy estate in a Chapter 11 proceeding, acting as the "debtor-in-possession." 11 U.S.C. §§ 1101(1), 1107.

2. The jury found that Boccard was entitled to $3,588,121.22 in breach of contract damages. The trial court subtracted $143,607.60, representing the amount Boccard had received through the bankruptcy court proceedings.

## A. General Legal Principles Regarding Standing

 Standing focuses on the question of who may bring an action. *See Patterson v. Planned Parenthood,* 971 S.W.2d 439, 442 (Tex.1998). Standing is a component of subject-matter jurisdiction, and subject-matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443 (Tex.1993); *see also DaimlerChrysler Corp. v. Inman,* 252 S.W.3d 299, 304 (Tex.2008) ("A court has no jurisdiction over a claim made by a plaintiff without standing to assert it."). Standing is never presumed, cannot be waived, and can be raised for the first time on appeal. *Tex. Ass'n of Bus.,* 852 S.W.2d at 444–45. We review standing under the same standard by which we review subject-matter jurisdiction generally. *Id.* at 446. Whether the trial court has subject-matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004).

## B. Exclusive Standing of Debtor–in–Possession to File Alter Ego Claim

Raytheon asserts that, before the bankruptcy action was filed, the alter ego claim belonged to United Engineers and RE & C; however, on the filing of the bankruptcy action, the alter ego claims passed into the bankruptcy estate. Raytheon contends that Washington Group, as debtor-in-possession, is the only party with standing to prosecute a claim belonging to the bankruptcy estate, including the alter ego claim.[3]

 The property of a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The phrase 'all legal or equitable interests of the debtor in property' has been construed broadly, and includes 'rights of action' such as claims based on state or federal law." *Highland Capital Mgmt. LP v. Chesapeake Energy Corp.,* 522 F.3d 575, 584 (5th Cir.2008). More precisely, "all legal or equitable interests" include causes of action belonging to the debtor when the bankruptcy petition is filed. *See Highland Capital Mgmt., L.P. v. Ryder Scott Co.,* 212 S.W.3d 522, 530 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) (citing *In re Educators Group Health Trust,* 25 F.3d 1281, 1283 (5th Cir. 1994)). A trustee, as the representative of the bankruptcy estate, is the only party with standing to prosecute causes of action belonging to the estate.[4] *See Tow v. Pa-*

3. A debtor-in-possession has many of the powers of a bankruptcy trustee. *See* 11 U.S.C. § 1107. Relevant to this case, section 323(b) of the Bankruptcy Code gives trustees the right to prosecute any action belonging to the bankruptcy estate, and debtors-in-possession have the same rights to sue and be sued as does a trustee. *See id.; see also* 11 U.S.C. § 323(b); *ASARCO LLC v. Americas Mining Corp.,* 396 B.R. 278, 325 & n. 32 (Bankr. S.D.Tex.2008). Because there is no distinction between the two terms for purposes of the present discussion, we will use the terms, debtor-in-possession and trustee, interchangeably.

4. "[A]ny act to obtain possession of property of the estate or of property from the estate" is subject to an automatic stay. 11 U.S.C. § 362(a)(3). The automatic stay is "self-executing, effective upon the filing of the bankruptcy petition," and it acts as "an injunction issuing from the authority of the bankruptcy court." *In re Gruntz,* 202 F.3d 1074, 1081–82 (9th Cir.2000). Accordingly, actions taken in violation of the automatic stay, including judicial proceedings, are void. *Id.* at 1082. Claims that are not administered or abandoned remain the property of the estate forever. *See* 11 U.S.C. § 554; *Matthews v. Potter,* 316 Fed.Appx. 518, 521 (7th Cir.2009) ("The trustee may abandon a legal claim, but until then only the trustee, as the real party in

*gano*, 312 S.W.3d 751, 757 (Tex.App.-Houston [1st Dist.] 2009, no pet.) (citing *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir.2008)); *Highland Capital Mgmt.*, 212 S.W.3d at 530. In other words, "[i]f a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim.[5] *In re Educators Group Health Trust*, 25 F.3d at 1284; *see In re S.I. Acquisition*, 817 F.2d 1142, 1153–54 (5th Cir.1987) (observing that the "general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly" requires that the trustee have the first opportunity to pursue estate actions without interference from individual creditors). In short, only a trustee or a debtor-in-possession can assert a claim that is property of the bankruptcy estate.[6] *See Tow*, 312 S.W.3d at 757.

■ To determine if a cause of action is property of the estate, a court must consider whether, under state law, the debtor could have asserted the action at the commencement of the bankruptcy proceeding. *See Highland Capital Mgmt.*, 212 S.W.3d at 530. United Engineers is a Pennsylvania corporation while RE & C,

---

[5] interest, has standing to sue."); *In re Associated Vintage Grp., Inc.*, 283 B.R. 549, 566 n. 14 (B.A.P. 9th Cir.2002) ("Unscheduled property remains 'property of the estate' after the case is closed (i.e. forever).")

**5.** Boccard contends that Bankruptcy Code section 544 does not provide authority for a trustee to pursue an alter ego claim on behalf of the bankruptcy estate. We agree. Generally, when courts allow a trustee to bring an alter ego claim, they permit it under section 541 rather than under section 544 because "[t]he purpose of [section] 544 is to give a trustee the power of a hypothetical lien creditor to avoid transfers of and liens on the debtor's property when the trustee cannot prevent them under other sections of the bankruptcy code.... Many courts have completely rejected [section] 544's use as a means for debtor corporations to bring alter ego actions." *In re Icarus Holding, LLC*, 391 F.3d 1315, 1319 n. 4 (11th Cir.2004). As mentioned, causes of action that, under applicable state law, were available to the debtor, at the time that the bankruptcy case commenced, become property of the estate pursuant to section 541. *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 245 (5th Cir.1988). The trustee "steps into the shoes of the debtor at the commencement of the case" and may assert those claims that are part of the debtor's estate. *ASARCO*, 396 B.R. at 325; *see In re E.F. Hutton Sw. Props. II, Ltd.*, 103 B.R. 808, 812 (Bankr.N.D.Tex.1989) ("If an action belongs to the estate, the trustee has the power and duty to prosecute the action for the benefit of all creditors and shareholders in the estate.").

**6.** Boccard asserts in its brief that Raytheon's challenge to Boccard's ability to assert the alter ego claim is not a challenge to its standing to assert that claim; rather, it is a challenge to Boccard's capacity to bring the claim. Boccard points out that a challenge to a party's capacity must be raised by a verified denial. *See* Tex.R. Civ. P. 93. It contends that Raytheon has waived its challenge to Boccard's right to bring the alter ego claim because Raytheon did not file a verified denial. We disagree with Boccard's characterization of Raytheon's challenge. The case law is clear that a trustee has exclusive *standing* to assert a claim that is property of the bankruptcy estate. *See Tow v. Pagano*, 312 S.W.3d 751, 757 (Tex.App.-Houston [1st Dist.] 2009, no pet.); *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 212 S.W.3d 522, 530 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). It is clear from the case law that Raytheon's challenge is to Boccard's standing, not to its capacity. Although capacity must be raised by verified denial, standing can be raised at any time. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex.2005). We also note that the issue of whether Boccard could assert the alter ego claim was adjudicated prior to trial in a motion for summary judgment proceeding in Boccard's favor. At that point, there was no longer a need for a verified denial. *See Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 899 (Tex.2011) (holding that "there was no longer any reason for a verified pleading" regarding capacity after issue had been adjudicated in summary judgment proceeding).

RECI, and Raytheon are Delaware corporations. The parties agree that Delaware and Pennsylvania law governs the determination of whether the alter ego claim belongs to the bankruptcy estate.

The parties also agree that the relevant inquiry here is whether Delaware and Pennsylvania law permit a wholly-owned subsidiary to pierce its own corporate veil to reach the assets of its parent corporation. No Delaware or Pennsylvania state court has answered this question.

Federal courts have held that Delaware law allows a debtor corporation to pierce its own corporate veil, thereby giving a bankruptcy trustee or debtor-in-possession exclusive standing to assert an alter ego claim on behalf of the bankruptcy estate. *See, e.g., In re Alper Holdings USA, Inc.,* 398 B.R. 736, 759–60 (S.D.N.Y.2008); *In re OODC, LLC,* 321 B.R. 128, 136–37 (Bankr. D.Del.2005); *In re Enron Corp.,* Adversary Pro. No. 02–3609 A, 2003 WL 1889040, at *3–7 (Bankr.S.D.N.Y. Apr. 17, 2003); *Pereira v. Cogan,* 265 B.R. 32, 35 (S.D.N.Y.2001); *Murray v. Miner,* 876 F.Supp. 512, 517 (S.D.N.Y.1995), *aff'd,* 74 F.3d 402 (2d Cir.1996). Federal courts interpreting Pennsylvania law have reached the same conclusion. *See, e.g., Jamuna Real Estate LLC v. Bagga,* 365 B.R. 540, 563–64 (Bankr.E.D.Pa.2007); *Cedarbrook Plaza, Inc. v. Gottfried,* No. CIV. A. 97–1560, 1997 WL 330390, at *9–10 (E.D.Pa. June 6, 1997).

Boccard asserts that these federal decisions lack analysis and ignore established Delaware and Pennsylvania corporate law. Boccard points out that the subsidiaries involved here—RECI, RE & C, and United Engineers—are each 100 percent owned by its respective parent corporation. Boccard contends that, under Delaware law, a wholly-owned subsidiary cannot pierce its own corporate veil to reach its parent. It bases this assertion on Delaware law indicating that, while a wholly-owned subsidiary owes a duty to act in its parent's best interest, the parent company does not owe the subsidiary a reciprocal duty to act in its best interest. *See, e.g., Trenwick Amer. Litig. Trust v. Ernst & Young, LLP,* 906 A.2d 168, 173 (Del.Ch. 2006) ("Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created. Parent corporations do not owe such subsidiaries fiduciary duties. That is established Delaware law."). Boccard argues that permitting a wholly-owned subsidiary to pierce its own corporate veil to reach its parent's assets is inconsistent with these principles. Boccard asserts that Pennsylvania law also embraces these basic corporate legal principles.

■ In support of its position, Boccard relies on *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del.1988). The facts and allegations in *Anadarko,* however, bear little resemblance to the instant case. The issue in *Anadarko* involved "whether a corporate parent and directors of a wholly-owned subsidiary owe fiduciary duties to the prospective stockholders of the subsidiary after the parent declares its intention to spin-off the subsidiary." *Id.* at 1172. The Supreme Court of Delaware concluded "that prior to the date of distribution the interests held by Anadarko's prospective stockholders were insufficient to impose fiduciary obligations on the parent and the subsidiary's directors." *Id.* The court concluded that, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its sharehold-

ers." [7] *Id.* at 1174. Significantly, the context in which the *Anadarko* court reached this conclusion was not one in which claims of insolvency were made, as in this case.[8] *See id.* at 1172–74.

██ Usually, the fiduciary duties of the directors of a wholly-owned subsidiary corporation run to the parent corporation, not to the subsidiary itself. *See Trenwick,* 906 A.2d at 200–01. However, once the subsidiary corporation is insolvent, those duties shift to the subsidiary and to its creditors. *In re Scott Acquisition Corp.,* 344 B.R. 283, 286–88 (Bankr.D.Del.2006); *accord Trenwick,* 906 A.2d at 203 n. 96; *see also In re Greater Se. Comm. Hosp. Corp.,* 353 B.R. 324, 342 n. 24 (Bankr. D.D.C.2006) (citing *Trenwick* for the proposition that fiduciary duties of director of wholly-owned subsidiary flow to parent corporation, except when subsidiary becomes insolvent). Although a wholly-owned subsidiary is not owed fiduciary duties by its corporate parent under normal circumstances, *Trenwick,* 906 A.2d at 191–92 (citing *Anadarko,* 545 A.2d at 1174), the Supreme Court of Delaware has recognized "that a parent owes fiduciary duties to its subsidiary when that subsidiary is insolvent." *In re Tronox Inc.,* 450 B.R. 432, 438 (Bankr.S.D.N.Y.2011) (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 101–02 (Del.2007)); *see In re Scott Acquisition Corp.,* 344 B.R. at 288–89 (holding that directors of wholly-owned insolvent subsidiary owe fiduciary duties not only to subsidiary's creditors, but also to subsid-

---

**7.** It is noteworthy that, in *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.,* the Delaware Chancery Court concluded that a subsidiary corporation's board was "free to take action in aid of its parent's business strategy" "[i]n the absence of any indication that they would be causing [the subsidiary corporation] to violate legal obligations owed to others." 906 A.2d 168, 201 (Del.Ch.2006). The court observed that directors of a wholly-owned subsidiary's board may follow the parent's instruction "unless those instructions required the board to violate the legal rights of others." *Id.* at 202. The *Trenwick* court explained that a narrow circumstance exists in which a subsidiary's directors would owe a separate duty to the subsidiary itself, in addition to their fiduciary duty of loyalty owed to the parent corporation: "At most, one might conceive that the directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefiting a parent corporation that they know will render the subsidiary unable to meet its legal obligations." *Id.* at 203. Thus, the corporate dynamics of a parent and its subsidiary shift when a parent uses its subsidiary for profit and, as part of that process, renders the subsidiary insolvent and unable to meet its legal obligations to others. A scenario common in the context of alter ego claims and alleged in this case.

**8.** The Supreme Court of Louisiana made the following observation regarding *Anadarko:*

The *Anadarko* ruling has been criticized as having been extended beyond its original intent. In *First American Corp. v. Al-Nahyan,* 17 F.Supp.2d 10, 26 (D.D.C.1998), the federal district court restricted *Anadarko's* statement to its narrow factual confines and rejected an interpretation which would result in a subsidiary's directors owing no duties to the subsidiary itself. *First American* held, instead, that "the directors of a wholly-owned subsidiary owe the corporation fiduciary duties, just as they would any other corporation." In accord is *Collins v. Kohlberg and Company (In re Southwest Supermarkets, LLC),* 376 B.R. 281, 283 (Bankr. D.Ariz.2007), where the federal bankruptcy court agreed *Anadarko's* statement in this regard had been interpreted in an overly broad manner. Instead, the court there held Delaware law, at issue in *Anadarko,* would impose fiduciary duties on the officers and directors of a wholly owned subsidiary that run directly to the subsidiary itself, and not only to its sole shareholder. In fact, the federal bankruptcy court found *Anadarko's* extension beyond its facts would yield shocking results in certain circumstances.

*Wooley v. Lucksinger,* 61 So.3d 507, 589–90 (La.2011) (footnotes omitted).

iary because duties owed to creditors are derivative of duties owed to subsidiary).

Here, central to Boccard's alter ego claims were its allegations—and ultimately Boccard's proof at trial—that the subsidiaries were, at all relevant times, operated as insolvent entities. Thus, the corporate legal principles cited by Boccard, regarding the duties owed between a subsidiary and its parent, are inapposite to a determination of whether a wholly-owned *insolvent* subsidiary can pierce its own corporate veil to reach its parent's assets. *See In re Mirant Corp.,* 326 B.R. 646, 651 (Bankr.N.D.Tex.2005) (concluding that *Anadarko* "was totally inapposite to case at bar" because claims involved in that case-fraudulent transfer, fraud, and alter ego—"presuppose or implicate the insolvency of the [debtor subsidiaries]").

Boccard also cites *Caplin v. Marine Midland Grace Trust Co. of New York* for the proposition that a debtor estate, and therefore the trustee, has no claim against a party or an entity that was *in pari delicto* with the debtor. *See* 406 U.S. 416, 430, 92 S.Ct. 1678, 1686, 32 L.Ed.2d 195 (1972). Boccard asserts that RECI and RE & C were complicit in permitting its respective parent to use it as an alter ego to the detriment of creditors. Boccard contends that, under *Caplin,* such complicity prevents the subsidiaries from asserting an alter ego claim. It avers that RECI and RE & C are "just as liable as Raytheon."

 Under Pennsylvania law, the legal fiction that a corporation is a legal entity separate and distinct from its shareholder may be disregarded, and the corporate veil "pierced," "whenever one in control of a corporation uses that control, or uses the corporate assets, to further [its] own personal interests...." *Village at Camelback Prop. Owners Assoc. v. Carr,* 371 Pa.Super. 452, 538 A.2d 528, 532–533 (1988)

(quoting *Ashley v. Ashley,* 482 Pa. 228, 393 A.2d 637, 641 (1978)).

 In Delaware, a plaintiff must produce evidence that demonstrates the parent corporation's complete domination and control of the subsidiary. *See Wallace v. Wood,* 752 A.2d 1175, 1183–84 (Del.Ch. 1999). The degree of control required is "exclusive domination and control ... to the point that [the subsidiary] no longer [has] legal or independent significance of [its] own." *Id.* at 1184. Thus, to pursue a parent corporation's assets under the theory of alter ego, a trustee need not establish that the subsidiary is *in pari delicto* with its parent. To the contrary, the parent's domination and control over the subsidiary are hallmarks of an alter ego claim.

 As explained by the Second Circuit Court of Appeals, "[W]here the parties do not stand on equal terms and one party controls the other, the *in pari delicto* doctrine does not apply." *Kalb, Voorhis & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 133 (2d Cir.1993). In *Kalb,* the court held that "[t]he *in pari delicto* defense does not apply to [alter ego] actions because the essential element of such claims is that a controlling shareholder forced the corporation to act for the benefit of the shareholder through domination and control." *Id.* In such cases, the element of mutual fault *(in pari delicto)* is not present, thereby rendering the defense unavailable. *See id.* Accordingly, the court held that "because [Kalb, Voorhis] alleges that AFC dominated and controlled Circle K, the *in pari delicto* doctrine would not bar Circle K from asserting an alter ego claim...." *Id.* Here, Boccard also alleged that the corporate parents dominated and controlled the subsidiaries. Thus, the *in pari delicto* doctrine would not apply. *See id.*

At this point, we are still left to determine whether Delaware and Pennsylvania

law permits a corporation to pierce its own veil. The decisions on this issue, in the context of whether a trustee has standing to assert an alter ego claim on behalf of the bankruptcy estate, vary widely from state to state.

Courts in some states, including Michigan, Arkansas, Alabama, Tennessee, Missouri, and Maryland have held that a corporation may not pierce its own veil to permit a trustee to pursue an alter ego theory on behalf of a bankruptcy estate. *See, e.g., In re RCS Engineered Prods. Co., Inc.*, 102 F.3d 223, 226 (6th Cir.1996) (Michigan); *In re Ozark Equip. Co., Inc.*, 816 F.2d 1222, 1225–26 (8th Cir.1987) (Arkansas); *In re Cello Energy, LLC*, No. 10–04877, 2011 WL 1332292, at *5 (Bankr. S.D.Ala. Apr.7, 2011) (Alabama); *In re Cincom iOutsource, Inc.*, 398 B.R. 223, 231–32 (Bankr.S.D.Ohio 2008) (Ohio); *In re Elegant Custom Homes, Inc.*, No. CV 06–2574–PHX–DGC, 2007 WL 1412456, at *4 (Arizona); *In re Del–Met Corp.*, 322 B.R. 781, 833–34 (M.D.Tenn.2005) (Tennessee); *In re Transcolor Corp.*, 296 B.R. 343, 367 (Bankr.D.Md.2003) (Maryland); *In re MarKay Plastics, Inc.*, 234 B.R. 473, 482 (Bankr.W.D.Mo.1999) (Missouri). These courts have generally held that, in those states, piercing the corporate veil is designed to protect the rights of third party creditors, not to protect the rights of the corporation itself, *see, e.g., RCS Engineered Prods. Co., Inc.*, 102 F.3d at 226, and allowing a corporation to pierce its own veil would have the effect of denying the corporation its own corporate existence. *See, e.g., In re Dakota Drilling, Inc.*, 135 B.R. 878, 884 (Bankr.D.N.D. 1991).

States in which courts have allowed an alter ego action to be brought by a corporation include Virginia, North Carolina, Nevada, Florida, Georgia, New York, and Utah.[9] *See, e.g., Steyr–Daimler–Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135–36 (4th Cir.1988) (Virginia); *Alvarez v. Ward*, No. 1:11CV03, 2011 WL 7025906, at *3–4 (W.D.N.C. Oct. 17, 2011) (North Carolina); *Trustees Of The Construction Industry & Laborers Health & Welfare Trust v. Vasquez*, 2011 WL 4549228, at *2–3 (D.Nev. Sept. 29, 2011) (Nevada); *In re Xenerga, Inc.*, 449 B.R. 594, 599–600 (Bankr. M.D.Fla. May 24, 2011); *Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 612 S.E.2d 296, 299 (2005) (Georgia); *Green v. Bate Records, Inc.*, 97 B.R. 163, 165–66 (S.D.N.Y.1989) (New York); *ANR Ltd. v. Chattin*, 89 B.R. 898, 903 (D.Utah 1988). In these cases, the courts sought to benefit the debtor corporation estate, "ultimately benefitting the estate's creditors" in accordance with "the Bankruptcy Code's ultimate goal of balancing the equities and interests of all affected parties in a bankruptcy case." *In re Elegant Custom Homes*, 2007 WL 1412456, at *3 (citing *In re Folks*, 211 B.R. 378, 386 (B.A.P. 9th Cir.1997)).

A similar holding was reached by the Court of Appeals for the Fifth Circuit in *S.I. Acquisition, Inc.*, 817 F.2d at 1152–53. There, the Fifth Circuit concluded that, under Texas law, a corporation could pierce its own corporate veil because "the predominate policy of Texas alter ego law is that the control entity that has misused the corporation form will be held accountable for the corporation's obligations." *Id.*

---

**9.** In one frequently cited case, *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1348–49 (7th Cir.1987), the Seventh Circuit held that Illinois law provided a bankruptcy trustee with the right to bring an alter ego action; however, the Illinois Supreme Court questioned that ruling in a decision holding that a corporation may not sue its parent corporation under an alter ego theory. *In re Rehabilitation of Centaur Ins. Co.*, 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015, 1018–19 (1994).

at 1152. The court explained that the law was based "on equitable concerns" and was not dependent on the specific relationships between the alter ego and the creditors. *See id.* As a result, the court concluded that the alter ego action was property of the bankruptcy estate. *Id.* at 1153. The court also noted that its decision furthered a policy underlying the Bankruptcy Code because, if the creditor's alter ego action were not stayed, it would "promote the first-come-first-served unequal distribution dilemma that the Bankruptcy Code … sought to prevent." *Id.* at 1153–54.

In line with *S.I. Acquisition,* the Court of Appeals for the Third Circuit explained the rationale for allowing a corporation to pierce its own veil, as follows:

It may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be either a creditor that was deceived or defrauded by the corporate fiction, or an involuntary tort creditor. In some states, however, piercing the corporate veil and alter ego actions are allowed to prevent unjust or inequitable results; they are not based solely on a policy of protecting creditors. Because piercing the corporate veil or alter ego causes of action are based upon preventing inequity or unfairness, it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory.

*Phar–Mor, Inc. v. Coopers & Lybrand,* 22 F.3d 1228, 1240 n. 20 (3rd Cir.1994) (citations omitted).

 Delaware law and Pennsylvania law, governing alter ego claims, is based on the equitable concerns discussed in *S.I. Acquistion.* "Delaware law permits a court to pierce the corporate veil 'where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner.'" *NetJets Aviation, Inc. v.*

*LHC Commc'ns LLC,* 537 F.3d 168, 177 (2d Cir.2008) (quoting *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 793 (Del. Ch.1992)). "To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness." *Id.* The factors that a court must consider when evaluating an alter-ego argument for veil piercing under Delaware law include,

whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Id.* at 176–77.

 Pennsylvania courts applying the equitable remedy of alter ego liability will allow the corporate veil to be pierced to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat the public purpose or shield someone from a liability for a crime." *Village at Camelback Prop. Owners Assn. Inc.,* 538 A.2d at 533. The Supreme Court of Pennsylvania addressed alter ego liability under Pennsylvania law in *Ashley v. Ashley,* 482 Pa. 228, 393 A.2d 637 (1978). There, the court summarized as follows:

This legal fiction of a separate corporate entity was designed to serve convenience and justice and will be disregarded whenever justice or public policy demand and when the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. We have said that whenever one

in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

*Id.* at 641 (citations omitted).

The focus of Delaware and Pennsylvania law is on the conduct of the corporation rather than on the relationship between the corporation and its creditors. The law of those states emphasizes equitable concerns, directed at holding the control entity accountable and addressing unjust enrichment to that company. We are convinced that the policies that persuaded the Fifth Circuit that alter ego claims against a debtor's parent corporation may be brought by the bankruptcy estate representative, rather than individual creditors, support the same conclusion in this case. *See S.I. Acquisition,* 817 F.2d at 1152–53; *see also Baillie Lumber,* 612 S.E.2d at 300.

■ Moreover, we recognize that the alter ego doctrine is an equitable remedy. *See Peacock v. Thomas,* 516 U.S. 349, 354, 116 S.Ct. 862, 866, 133 L.Ed.2d 817 (1996). To the extent that each were damaged by its respective parent's domination and control over it to the point that it was rendered insolvent and unable to meet its legal obligations, the subsidiary should have standing to assert an equitable claim against its dominant parent. *See In re iPCS, Inc.,* 297 B.R. 283, 298 (Bankr. N.D.Ga.2003) (interpreting Delaware law and holding that estate representative had standing to assert alter ego claim of debtor corporation).

■ We conclude that, under Delaware and Pennsylvania law, a corporation, par-

ticularly an insolvent one, has standing to pierce its own corporate veil under an alter ego theory to reach the assets of its parent. *See S.I. Acquisition,* 817 F.2d at 1152. We further conclude that such claim passes into the bankruptcy estate on the filing of the bankruptcy petition. *See* 11 U.S.C. § 541(a)(1). At that point, the trustee or debtor-in-possession has exclusive standing to assert the alter ego claim. *See Tow,* 312 S.W.3d at 757; Highland Capital Mgmt., 212 S.W.3d at 530. As applied to this case, the debtor-in-possession, Washington Group, was the only party with standing to assert an alter ego claim against Raytheon. Boccard did not have standing to assert the alter ego claim. Thus, we hold that the trial court was without subject-matter jurisdiction to render judgment based on the equitable claim of alter ego.

We sustain Raytheon's first issue.[10]

### Conclusion

Because we hold that Boccard did not have standing to pursue its alter ego claim against Raytheon, we vacate the trial court's judgment and dismiss the case.

10. Because this issue is dispositive, we do not address Raytheon's remaining three issues.

*See* TEX.R.APP. P. 47.1.